(No. 23076.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILBUR MOORE, Plaintiff in Error.

*Opinion filed December 16, 1935.*

JAMES J. BARBOUR, and ODE L. RANKIN, for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, and RICHARD H. DEVINE, of counsel,) for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

The defendant, Wilbur Moore, was indicted in the criminal court of Cook county for the crime of burglary. The indictment consists of two counts. Of these, the first charges that the defendant broke into the store of the Illinois Liggett Drug Company in the city of Evanston with intent to steal property of the company. The second count is similar to the first, except that it charges that the entry of the store was made without force. The defendant was found guilty by a jury as charged in the indictment. Motions for a new trial and in arrest of judgment were made and denied and the defendant was sentenced to the penitentiary for an indeterminate term of from one year to life imprisonment. He prosecutes this writ of error to review the record.

A store of the Illinois Liggett Drug Company in Evanston was broken into in the early morning of December 19, 1934. This store is located in the southwest corner of a building at the intersection of Central street and Railroad avenue. Other stores, professional offices and apartments occupy space in the building. In addition to the main floor located on the street level the space occupied by the Liggett Company included a basement somewhat larger than the store. Its basement was entirely enclosed, being walled off separately from the basement under the other stores which faced on Central street. An enclosed stairway leads to the Liggett basement from the drug store and there is a door at the bottom of the stairway. Entrance to the store was effected by an opening made in the basement wall and by breaking a riser and one of the steps of the stairs. The first opening was made at a place in the wall where a window had been closed up with tile. The space occupied by the Liggett Company was equipped with a silent burglar alarm system. About 1:00 o'clock in the morning of December 19, 1934, a signal was given to the central office of the American District Telegraph Company. The attendant there notified Fred C. Schmidt, the roundsman

for the district, and C. J. Delbridge, the assistant manager of the store. Schmidt arrived about ten minutes later, examined the premises and found the exterior undisturbed. Upon the arrival of Delbridge he and Schmidt went into the store. Five sugar bags loaded with 173 cartons of cigarettes were found on the floor. They searched the store and discovered the defendant crouching behind the cigar counter. The latter remarked that it looked like a funny situation for him, came from behind the counter, surrendered, and handed a flash-light to Schmidt.

Peter Geishecker, a police officer, testified that in response to a radio call he went to the drug store, arriving there about 1:50 A. M.; that he arrested the defendant, whom he knew and addressed as "B"; that on the way to the police station he inquired how the former happened to break into the store; that the defendant replied that the store had been broken into on another occasion and that someone had informed him that the place was "easy to make," and further, that he had intended to peddle the cigarettes. Upon the trial the defendant denied making these statements.

Anton Schultz, another police officer, and officers Bergen and Sanford, observed Schmidt's automobile in front of the entrance to the drug store and went inside. Schultz found a sledge hammer owned by the defendant underneath the stairs leading from the basement to the main floor of the drug store. These three officers likewise appeared to be acquainted with the defendant, calling him "B." Schultz testified that he had a conversation with the defendant at the police station, in the presence of officers Geishecker, Bergen and Sanford; that in response to an inquiry as to why he committed the offense, the defendant answered, "They got me, and don't talk about it; they took me," and also stated, "I needed a little money and I went in there and thought I would peddle the cigarettes and get some money for Christmas." The defendant denied mak-

ing any statement to Schultz. The defendant's flash-light, the five bags containing the cigarettes, and the sledge hammer, were admitted in evidence.

The defendant was thirty-eight years of age at the time of the trial and had pursued his occupation as a plumber in Evanston and Wilmette for several years. He had worked in the building in which the drug store is located, and also in the basement of the store, prior to December, 1934. For about two weeks preceding the burglary he had been working in the building for William S. Moore, his father, likewise a plumber. The latter had been hired by the real estate agents who managed the property to make changes in the plumbing in the basement under the contiguous store room, which was being remodeled for use as a beauty parlor, and by its proprietor to install new fixtures in her establishment. The defendant testified that he had been employed in the evenings on the particular contract owing to the fact that the hot and cold water connections could not be changed during business hours; that on the evening of December 18, 1934, he and one Ray Steiner worked until 12:00 o'clock, when the latter departed, and that he remained to collect the tools and plumbing material; that he had promised the janitor he would bank the fire in the boiler before leaving, and that while so engaged one Ernie Erickson came into the boiler room (also separated from Liggett's basement) through an alley door and sought permission to sleep there; that he had known Erickson, a man about forty-five years of age, for seven or eight years; that the latter had served a sentence in the penitentiary at Joliet and had been involved in larcenies of automobiles; that he informed Erickson, nevertheless, he could sleep on the bags and straw on the floor, and that he directed Erickson to advise the janitor, upon the latter's arrival in the morning, that the witness had granted him permission to sleep in the boiler room. According to the defendent he then went to his residence, arriving there about

1:00 o'clock, soon began to have qualms about the presence of Erickson in the basement and returned to the building, entering through an alley door, which was usually kept open. The defendant testified further that he did not see Erickson and was leaving the premises for the second time when he observed that some screens had been disturbed, that a coat which Erickson had been wearing was lying near them, that a hole had been made through a wall under a stairway and that a bag had been thrown over it; that he obtained a flash-light from Steiner's kit and flashed it through the basement; that he called to Erickson, but received no response; that he then crawled through the two holes heretofore mentioned and went into the drug store, where he found Erickson at the end of the cigar counter, with four loaded bags which he was preparing to take away. The defendant stated that he had been in the drug store about a minute, urging Erickson to leave, when Schmidt and Delbridge appeared at the front door; that he looked around, but Erickson had vanished in the rear and that he had not seen him since. He added that while Schmidt and Delbridge were awaiting the arrival of the police one of them picked up a glove lying near the front door and made an inquiry as to whether it belonged to him; that he answered in the negative; that the other then stated that someone else must have been in the store, and that in reply he reiterated that he had not stated another person was present.

From the defendant's testimony it appears that the first time he mentioned the presence of Erickson was in a conversation with the chief of detectives the following morning. On cross-examination the defendant also testified: "I did not state this story about Erickson to any of the officers that arrested me nor to the A. D. T. man, nor to the man from Liggett's." In rebuttal, officers Schultz and Geishecker, each of whom had been on the Evanston police force for more than twenty-one years, testified that they

did not know, and prior to the trial had never heard of, a Harry Erickson who had served a sentence in the penitentiary. Schultz also stated that he was present when the defendant talked with the chief of detectives and that the name of Erickson was not mentioned. He testified further that he found a pair of ordinary canvas gloves in the drug store immediately after the burglary. When interrogated on cross-examination he added that at the police station the defendant disclaimed ownership of the gloves, and that in reply to a question as to whether anyone was with the defendant, the latter answered that he was there alone, stating, "Now they have got me and there is no use for me to try and tell you there was somebody else with me, because there was not." A justice of the peace, called as a witness on sur-rebuttal, testified that he was acquainted with a Harry Erickson from Evanston who had been in the penitentiary. On cross-examination the witness added that he had not seen Erickson for two or three years. We observe that although the defendant referred to Erickson as Ernie, the testimony of three witnesses, two for the People and one for the defendant, relates to Harry Erickson. No explanation of the discrepancy has been offered.

To obtain a reversal the defendant contends that the trial court erred in refusing to give the jury an instruction concerning the presumption as to his good character. The defendant in the case of *Addison* v. *People,* 193 Ill. 405, made a similar complaint. The proffered instruction in the case cited was as follows: "The law also presumes that the defendant has a good character and reputation as a law-abiding, peaceable citizen until the contrary is shown by the evidence, and it is not necessary for the defendant to prove his reputation in that respect. The jury is not at liberty to consider the omission to prove good character as a circumstance against him, but must presume that he is a man of good character and reputation in that respect—and

that, without any proof on the subject—and should take the good character of the defendant into consideration in making up their verdict." In holding that the instruction tendered was properly refused, this court observed that a defendant enjoys the right to put his reputation as a law-abiding, peaceable citizen in issue, and that when such evidence is offered the prosecution may offer evidence to the contrary, and have the opportunity to prove, if possible, that the defendant's character and reputation are bad. The defendant in the present case, as in *Addison v. People, supra*, did not elect to put his reputation in issue, but sought by the refused instruction the benefit of an affirmative finding of good reputation and character without proof and without affording an opportunity to the prosecution to challenge his claim. The defendant cannot receive the benefit of proof which perhaps could not be made. There was no error in refusing to give the jury the instruction requested by the defendant.

To sustain his first contention, however, the defendant has recourse to *People v. Haas*, 293 Ill. 274. The State's attorney, in his closing argument to the jury in the case cited, commented on the fact that the defendant had not submitted testimony of previous good character. The court held that the character of one accused of a criminal offense is presumed to be good until the contrary is proved, and that no evidence to impeach his character is admissible unless he has opened the door for such evidence by introducing proof of good character. "It follows," the court said, "that the State's attorney has no right to call to the attention of the jury the defendant's failure to offer such proof, or to argue that the lack of such proof tends, under the facts of the case, to overcome the presumption of good character." It is not charged that the prosecution made any attempt in the present case to assail the good character of the defendant. Manifestly, the case of *People v. Haas* is not parallel to the present case.

It is also earnestly contended that the defendant was not proved guilty beyond a reasonable doubt. The evidence adduced discloses that he was the sole person found in the drug store following its forcible entry; that he was discovered behind a cigar counter; that a substantial quantity of tobacco had been removed and put into bags preparatory to removal from the store, and that he could not at that time give a valid reason for his presence. The possession of stolen property, the proceeds of a burglary or larceny, soon after the commission of the offense is evidence of the guilt of the person in whose possession it is found, and is sufficient to warrant a conviction unless such possession is explained or there appears from all the evidence a reasonable doubt of his guilt. (*People* v. *Mizzano,* 360 Ill. 446; *People* v. *Sampson,* 337 id. 643; *People* v. *Graves,* 331 id. 268.) When apprehended the defendant stated, according to two witnesses, that he took the cigarettes for the purpose of peddling them, and, according to one of them, asserted that he, alone, was present in the store. Upon the trial the defendant admitted his denial of the presence of a second person. His silence with respect to Erickson when confronted by the manager of the drug store, the A. D. T. roundsman and the police officers tended to refute his testimony that Erickson committed the offense. The jury undoubtedly deemed it strange that the defendant did not avail himself of the first opportunity of announcing the presence of Erickson in the building. The *corpus delicti* was conclusively proved by the breakings and the removal of the cigarettes, and the jury was fully warranted in finding that the defendant was the person who perpetrated the burglary.

The jury was afforded the opportunity of observing the conduct and demeanor of the witnesses both for the People and for the defendant while testifying and was in a better position to weigh their testimony than is a reviewing court. The law has committed to the jury the determination of the credibility of the witnesses and of the weight to

be accorded to their testimony, and where the evidence is merely conflicting this court will not substitute its judgment for that of the jury. *People* v. *Fitzpatrick,* 359 Ill. 363; *People* v. *Kubish,* 357 id. 531.

We find no reversible error in the record, and the judgment of the criminal court will therefore be affirmed.

*Judgment affirmed.*