(No. 23435.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN DOYLE, Plaintiff in Error.

*Opinion filed April 24, 1936.*

THADDEUS C. TOUDOR, for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, RICHARD H. DEVINE, and JOHN T. GALLAGHER, of counsel,) for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

John Doyle, otherwise called John Burke, was indicted in the criminal court of Cook county. The first count of the indictment charged robbery while the accused was armed with a dangerous weapon, and the second count charged robbery, with no allegation as to a weapon. The defendant entered a plea of not guilty, and was tried by a jury which did not agree upon a verdict. A second jury trial resulted in a verdict of guilty and the defendant was sentenced to the penitentiary for a term of one year to life for the crime as charged in the first count of the indictment. He has sued out this writ of error.

The evidence shows that on the morning of Monday, November 19, 1934, at about 4:15 o'clock, two armed men wearing rose colored automobile glasses, entered the office of Ruehl J. Siegel, in a restaurant owned and operated by himself and wife, Bessie Siegel, at Eighty-third street and South Chicago avenue in the city of Chicago. Siegel and his wife were present at their respective desks when the robbers entered and two porters in the restaurant were brought into the office; one of the robbers then gave the command, "Hold up your hands and keep your eyes on the floor. This is a hold-up." One of the robbers told Mrs. Siegel to place her hands on the top of her desk and to keep her eyes on the floor or on the desk, and the other told Siegel to keep his eyes on the floor and his hands up. Siegel, who apparently was then standing, was directed to sit down and his chair was swung around by one of the

robbers to face a filing cabinet. One of the robbers, described as "stout," then proceeded to the safe and took therefrom $2138. The money thus taken was the receipts from three restaurants owned by and operated under the direction of Siegel and his wife as partners. In addition to the money the robbers took a German Luger revolver, an express messenger rifle and a Winchester rifle. The robbers were in the office ten or fifteen minutes during the time of the robbery. Siegel testified that he did not see the robbers as they entered, but as the command was given he faced them momentarily and again saw them by a side glance while he had his head down.

Owing to the recent appearance of counterfeit bills, Siegel had directed the managers of the branch restaurants to place a stamp mark on all the bills of five-dollar denomination or over which went to the main office. The figures on the bills designated the particular restaurant from which they came. One of the branches was at Sixty-seventh street and Western avenue and the other at 232 West Garfield boulevard, and it could thus be ascertained from which of the restaurants the money came. Ten five-dollar bills were introduced in evidence and they bore the rubber-stamp mark indicating that they came from the branch restaurant at Sixty-seventh street and Western avenue. Other money in the safe on the night of the robbery bore the same stamp mark, but the exact amount was not known by Siegel.

During the robbery the man described as "stout" said, "I hate to do this but things are pretty tough." Siegel identified the man making that statement as the defendant. The next time Siegel saw the defendant was about 1:00 or 1:30 o'clock the next morning at the detective bureau of the central police station in Chicago. In response to a telephone call Siegel went to the detective bureau, and was told by police officers that four men were under arrest, and he was asked to ascertain whether he could identify money which had been found in the coat of the defendant in the

room occupied by him. From a line-up of about nine men on a platform he picked the man in the fifth position in the line as one of the robbers. It was Doyle, the defendant. When he was identified the defendant told Siegel he was mistaken, but Siegel said he did not think so. The defendant asked where Siegel's place was and Siegel replied, "You know where it is at." The defendant said he did not know. Siegel also identified the defendant by his voice and identified the stamp marks on the money. He also pointed out Albert Burke, a brother of the defendant, as the one who resembled the cross-eyed man. Leo Isaacs, the manager of the restaurant at Sixty-seventh street and Western avenue, stated that he had a stamp made to order and that he made the stamp marks on the money which was exhibited at the trial. Siegel was shown colored glasses which had been taken by the police officers from the premises where the defendant roomed. Siegel stated they were of the same type but were not rose colored glasses similar to those worn by the robbers at the time of the commission of the crime.

Bessie Siegel testified that one of the robbers was cross-eyed and was the one who told her to keep her hands and eyes on the desk where she sat; that she was nervous and frightened and obeyed. The cross-eyed one kept a revolver pointed at her. The other robber told her husband to hold his hands up. She did not identify the defendant.

Warren Ross, a police officer, testified that he received an anonymous telephone call at the detective bureau on November 20, 1934, and he and three or four other police officers went to the room where the defendant lived at about 11:00 or 11:15 o'clock at night, and on inquiry was directed by one of the defendant's brothers to the room occupied by the defendant. They made a search of the house and from the pocket of a coat hanging on the wall back of the bed on which the defendant was lying the officers found and removed a roll of bills. The defendant was placed under arrest and was told that he was wanted for the "Siegel

stick-up." The defendant was asked where he obtained the money found in the coat pocket and replied that he could not tell, and upon being asked why, stated, "Well, it would be too bad for me." At the trial officer Ross was shown the bills which had been introduced in evidence and stated that he had seen them with other bills at the time of the defendant's arrest. The amount found was $270, $250 being taken from the defendant's coat pocket; $20 was in one-dollar bills, obtained from a dresser drawer in the same room. The defendant said that the latter amount belonged to his brother. The officer marked the twenty one-dollar bills with an "X" and on the top bill placed the name "Edward," and put a clip on the bills. That money was kept separate from the amount taken from the coat pocket. The larger bills showed the stamp mark "67" and were the same ones taken from the defendant at the time of his arrest. No guns were found in the place where the defendant and his brothers roomed. The age of the defendant was twenty-eight years.

The defense was that of an alibi, and in support of it the defendant, his three brothers, Albert, James and Edward Burke (or Doyle), a Mrs. Boals, the owner of the house at 242 West Fifty-ninth place where the defendant roomed, and a visitor there named McGinley, testified to the defendant's presence in his room throughout the night of November 18 and the morning of the 19th. The defendant and his brothers occupied a large room containing two beds. The testimony is that Albert and McGinley slept in one bed, James and Edward in another bed and that the defendant slept in a Morris chair. James first testified that he slept alone, but afterward changed his testimony. The defendant stated that he reached his room at about 5:00 o'clock in the evening and remained until 7:30 o'clock the next morning. Albert and James testified that they went to the movies and when they returned the defendant and McGinley were in the room, and that Ed-

ward came to the room at about 12:30 o'clock. Mrs. Boals testified that the door to the defendant's room was open during the night and when she was in the hall, which was kept lighted, she saw the defendant. It appeared that Mc-Ginley was sick during the night and disturbed the other occupants of the room by his numerous visits to a bathroom on the floor above. The testimony is in accord that each time different occupants of the room were awakened the night of the 18th and morning of the 19th of November the defendant was present in the room. On the surface it seems to account for every sleeping and waking moment of the defendant on the night in question. The jury may have considered such a circumstance so unusual as to be at least significant.

Albert Burke, also known as Doyle, testified to the occasion when the police officers called at the defendant's room; that he knew that his brother had some money; that it was in excess of $100, and that it was left in the pocket of an old coat in the defendant's room; that at the police station Siegel pointed out the witness as the cross-eyed man who was one of the robbers at his office.

Edward Burke testified that for about four months previous to the trial he had a room by himself on the floor above the room occupied by the defendant and his other brothers; that the money which was taken from his dresser was the accumulation of his savings as a foreman at the International Harvester Company, and that it was four five-dollar bills and was not in one-dollar bills.

Richard E. Royce, a truck driver, an acquaintance of the defendant for about fifteen years, testified that he and one Edward Rockwood visited a barbecue stand operated by Siegel at Sixty-seventh street and Western avenue on or about April 12, 1935, and he tendered a twenty-dollar bill in payment for a purchase he made and received in change eighteen dollars, including one ten and a five-dollar bill, and some cents. He asked the girl working at the lunch

counter to make a notation on the five and ten-dollar bills given him, which she did, and he put the numbers on a paper which he had with him. The bills were marked with figures looking like a "6" and a "7." He knew the defendant had been arrested and heard that money at that restaurant had been marked. It was at the defendant's request that he made the investigation as to the marked bills. The defendant's counsel sought to introduce the bills in evidence but upon objection they were excluded.

The defendant testified that he had about $250 in money in his coat pocket and that he had it for about six months. His reason for not keeping the money in a bank was that he thought that amount would be safe in the house; that he could trust his brothers and friends and the room was kept closed when he was away. He testified that he never saw any marks on the money while it was in his possession but he had not looked for marks. He testified that when he was on his way to the police station with police officer Ross he told the officer he did not know why he had been arrested, and asked for some of his money, stating that he was hungry; that the officer gave him $30, but it was taken from him by officers in the police station. He testified that at the show-up Siegel said to him, "You look like the fellow who held me up" but that he told Siegel he must be mistaken for he went to bed about ten o'clock Monday night (apparently meaning Sunday night), because he had to get up at 6:00 o'clock the next morning.

In rebuttal police officer Ross testified that the $20 he took from the top dresser drawer in the defendant's room was in one-dollar bills and that he still had this money in his possession at the time he testified.

It is contended, first, that the evidence as to the identification of the defendant is vague, uncertain and insufficient to convict him. Siegel's testimony concerning the identification has already been set out in detail. Money belonging to him and his wife bearing certain stamp marks

was found in the possession of the defendant the day following the robbery without a satisfactory explanation of its possession, and according to one witness' testimony the defendant admitted that he could not tell where he obtained it without prejudice to himself. It is argued that Bessie Siegel had as good an opportunity to observe the robbers as her husband yet she was unable to identify the defendant. She stated that she was nervous and obeyed the robber's command to keep her head down, but she saw the face of one of the robbers and said that he was cross-eyed.

In the argument in defendant's brief that the evidence shows that the defendant was not present at the time of the robbery, reference is made to Albert Burke's testimony that Siegel pointed him out as the cross-eyed man and also pointed out Edward as one of the men present at the robbery. The necessary inference from this argument is that if Siegel made that statement at the show-up his testimony at the trial was incomplete or inconsistent. Neither Siegel nor his wife testified that Edward Burke was one of the robbers. It does not weaken the testimony against the defendant that one or more of his brothers were not indicted. The jurors saw and heard the witnesses. They had ample opportunity when Albert was on the witness stand to observe whether he was cross-eyed. They had an equal opportunity of judging whether officer Ross was mistaken in stating that the money he took from the dresser drawer was in one-dollar bills, or that Edward was mistaken in stating that the amount was in five-dollar bills.

A judgment will not be reversed merely because there is only one identifying witness. (*People* v. *Kerbeck,* 362 Ill. 251; *People* v. *Gerdy,* id. 130; *People* v. *Wisz,* 360 id. 126; *People* v. *Gasior,* 359 id. 517; *People* v. *Fortino,* 356 id. 415; *People* v. *Schanda,* 352 id. 36.) The evidence, however, did not depend simply upon what an eyewitness saw and heard at the time the crime was committed. The defendant was in possession of money stamped by the

restaurant from which it was transferred to the main office. While Siegel could not say that particular bills had been in his safe, the manager of the branch restaurant identified the money as that which he had stamped before delivering it to Siegel. This with the other evidence in the case was sufficient to sustain a conviction. (*People* v. *Moore,* 362 Ill. 102; *People* v. *Mizzano,* 360 id. 446; *People* v. *Sampson,* 337 id. 643; *People* v. *Graves,* 331 id. 268.) The court will not reverse a judgment of conviction merely because the evidence is conflicting and thereby substitute its judgment for that of the jury. *People* v. *Abelsky,* 359 Ill. 387; *People* v. *Fitzpatrick,* id. 363; *People* v. *Bolger,* id. 58; *People* v. *Kidd,* 357 id. 133.

The overruling of the defendant's motion to suppress evidence is urged as error. The bill of exceptions contains no motion to suppress evidence. No grounds for such a motion are stated, no authorities are cited and no reasons given why such a motion should be allowed, except from what is stated in point 3 of the defendant's brief, as follows: "We most respectfully submit that this motion should have been allowed, as the state of the record—the evidence—clearly shows." This is not sufficiently definite to disclose how the defendant has been prejudiced by the denial of the motion.

It is contended that the court erred in denying the defendant's motion for a new trial. The court denied an oral motion for a new trial and an exception was taken to the ruling. The court thereupon announced that counsel might submit a written motion supported by reasons for its allowance. The defendant's counsel expressed a desire to make a motion in writing but made none within the time allowed by the court. At the time the oral motion was made the court stated that if the reliance for a new trial was upon the evidence presented the making of such a motion would be of no avail. The defendant has shown no prejudice by any ruling of the court upon the motion.

The evidence was ample to sustain the verdict and judgment. No errors of law were committed upon the trial sufficient to justify a reversal of the judgment.

The judgment of the criminal court of Cook county is affirmed.

*Judgment affirmed.*